RICHARD E. BURKE

*v.*

CLARENCE E. SNIVELY *et al.*

*Opinion filed February 17, 1904—Rehearing denied April 7, 1904.*

1. ACTIONS AND DEFENSES—*suit to enjoin State officials from misuse of public funds is not an action against the State.* In equity the money in the State treasury belongs to the people, and a suit by a taxpayer to enjoin misappropriation by State officials of such money is not a suit against the State.

2. INJUNCTION—*public officials may be enjoined from devoting public funds to purpose not authorized by law.* Public officials charged by law with the duty of making certificates or warrants authorizing payment of money from the State treasury may be restrained from issuing such certificates or warrants for purposes not authorized by law, and the State Treasurer may be enjoined from paying them.

3. SAME—*payment of money in pursuance of an unconstitutional law is not "authorized by law."* An appropriation of public funds in pursuance of an unconstitutional statute is not authorized by law and may be restrained by injunction.

4. CONSTITUTIONAL LAW—*when practical construction by other departments of government will not control.* The meaning of a constitutional provision is to be ascertained primarily from the language employed, and it is only when ambiguity is found and the meaning is doubtful that the extrinsic aid of practical construction given by other departments of the government will be resorted to.

5. SAME—*when acts of legislative and executive departments are not entitled to great weight as practical aids in construction.* Acts of the legislative and executive departments are not entitled to great weight as aids to construction of a provision of the constitution, where the acts of the same departments, nearer in point of time to the adoption of the constitution, present an opposite construction.

6. SAME—*proviso is considered in construing constitutional provision.* In construing a constitutional provision containing a proviso both the body of the provision and the proviso must be considered, since a proviso may qualify the body of the provision although it cannot enlarge the scope or force thereof.

7. SAME—*constitutional provision prohibiting appropriations in aid of canals construed.* Separate section 3 of the constitution, relating to the control and management of the Illinois and Michigan canal and prohibiting appropriations in aid of railroads or canals, etc., prohibits an appropriation by the legislature in aid of the Illinois and Michigan canal, and limits the power of the legislature, in the matter of such aid, to directing the use of the surplus earn-

ings of the canal for its enlargement or extension. (HAND, C. J.,
and WILKIN, J., dissenting.)

8. SAME—*when question that constitutional provision impairs contract
cannot be raised.* The question that a provision of the State consti-
tution impairs the obligation of contract between the United States
and the State cannot be raised in a suit by a tax-payer to enjoin
State officials from disbursing State funds in pursuance of a stat-
ute which violates such constitutional provision.

APPEAL from the Circuit Court of Sangamon county;
the Hon. JAMES A. CREIGHTON, Judge, presiding.

DARROW & MASTERS, for appellant:

A distinction is drawn between enjoining State offi-
cers from performing unconstitutional acts and ordering
State officers to obey the law. *Pennoyer* v. *McConnaughy*,
140 U. S. 1; *Cunningham* v. *Macon*, 109 id. 453; *Hagood* v.
*Southern*, 117 id. 52; *Haus* v. *Louisiana*, 134 id. 1.

A suit to restrain the insurance superintendent from
paying a tax collected to the State Treasurer and to re-
strain the State Treasurer from receiving it is not a suit
against the State. *Insurance Co.* v. *Van Cleave*, 191 Ill. 410.

A suit against the Governor, Secretary of State and
Treasurer of State to restrain and enjoin them from sell-
ing land under an unconstitutional statute is not a suit
against the State. *Pennoyer* v. *McConnaughy*, 140 U. S. 1.

The constitution of Illinois expressly prohibits the
legislature from ever loaning the credit of the State in
aid of railroads or canals, or ever making appropria-
tions from the treasury of the State in aid of railroads
or canals.   1 Starr & Cur. Stat. p. 206.

In the main, the general principle governing the con-
struction of statutes applies also to that of constitutions.
*Dunn* v. *Great Falls*, 13 Mont. 58; *Taylor* v. *Taylor*, 10 Minn.
107; *People* v. *Fancher*, 50 N. Y. 291; *People* v. *Hutchinson*,
172 Ill. 498; Potter's Dwarris on Statutes and Constitu-
tions, 654.

In the interpretation of constitutions words are pre-
sumed to have been employed in their natural and ordi-

nary meaning. *Springfield* v. *Edwards*, 84 Ill. 643; *People* v. *Railroad Co.* 24 N. Y. 486; Story on the Constitution, sec. 451; *Gibbons* v. *Ogden*, 9 Wheat. 188; *Hills* v. *Chicago*, 60 Ill. 86; *Cook County* v. *Hanecy*, 164 id. 566.

Courts are not justified in giving a strained construction or astute interpretation to a constitutional clause in order to relieve against any individual or local hardship. *Law* v. *People*, 87 Ill. 385.

Questions of the wisdom, expediency or justice of constitutional provisions afford no basis for construction. *Newell* v. *People*, 7 N. Y. 101; *State* v. *McClellan*, 138 Ind. 395; Cooley's Const. Lim. (6th ed.) 87.

Contemporary construction can never abrogate the text. It can never fritter away its obvious sense. It can never narrow down its true limitations. It can never enlarge its natural boundaries. Story on the Constitution, 407; *Evans* v. *Myers*, 25 Pa. St. 116; *Sadler* v. *Langham*, 34 Ala. 311; *Barnes* v. *First Parish*, 6 Mass. 401; *Railroad Co.* v. *United States*, 91 U. S. 72; *Collins* v. *Henderson*, 11 Bush, 74; *People* v. *O'Toole*, 164 Ill. 344.

It is perfectly apparent that the proviso, which says that the surplus earnings of any canal may be appropriated for its enlargement or extension, saves from the general inhibition of the canal section something which would have been included in it except for the proviso. The proviso is intended to restrain the enacting clause and except from it that which would otherwise have been within it. *Bank* v. *United States*, 9 Wall. 227; *Wayman* v. *Southard*, 10 Wheat. 3; *United States* v. *Dickson*, 15 Pet. 168; *Minis* v. *United States*, id. 523; *Boon* v. *Juliet*, 1 Scam. 258.

The proviso, in effect, looks to a condition of things under which there would be surplus earnings of the canal. It, in effect, concedes that while the State should not appropriate for the maintenance of the canal or in aid of it, it would be unreasonable to prevent the canal from having for its own development and extension those earnings which it had accumulated over and above what

should be necessary for its maintenance. It is a familiar rule of construction that the express mention of one thing implies the intention to exclude others. *People* v. *Mayor*, 51 Ill. 17; *Prettyman* v. *Supervisors*, 19 id. 410.

GEORGE M. BAGBY, also for appellant:

Whenever it is clear that the legislature has transcended its authority and that a legislative act is in conflict with the constitution, it is imperatively required of the court to maintain the paramount authority of the instrument which it is solemnly pledged to support, and to declare the act inoperative and void. *Lane* v. *Doe & Dorman*, 3 Scam. 238; *Dodge* v. *Cole*, 97 Ill. 339.

A court of chancery will afford preventive relief against any illegal appropriation of public funds by injunction. *Colton* v. *Hanchett*, 13 Ill. 615; *Perry* v. *Kinnear*, 42 id. 160; *Springfield* v. *Edwards*, 84 id. 626; *Beauchamp* v. *Kankakee County*, 45 id. 274.

A bill will lie at the suit of any tax-payer of the State to enjoin the action by public agents or officers which will lead to the misapplication of public money, or the payment of such money on illegal contracts or without authority of law; and the fact that the Governor's approval of their acts is also necessary to the payment of public money will afford no sufficient reason against enjoining the illegal action of such public agents. *Littler* v. *Jayne*, 124 Ill. 124.

No one may complain of a law impairing the obligation unless he has an interest in the contract the obligation of which is said to be impaired. 15 Am. & Eng. Ency. of Law, (2d ed.) 1059.

The parties whose rights it is insisted are affected are not before this court complaining that the obligation of their contract, if contract there be, has been impaired by any action of the constitutional convention of 1870, and no one else may be heard to complain. *Templeton* v. *Horne*, 82 Ill. 491.

Where the constitution prohibits a thing, it must prevail over a statute requiring that thing to be done. *Cook County* v. *Industrial School*, 125 Ill. 540.

Where the law creates a particular fund out of which appropriations for a given purpose must be made and paid, and limits such appropriations to specified purposes, it is mandatory, and its directions must be strictly followed until changed. *People* v. *Canal Trustees*, 14 Ill. 404.

Grants of land do not mean the mere grant itself, but the right, title, legal possession and estate, property and ownership legally resulting upon a grant of land to the owner. *United States* v. *Miranda*, 16 Pet. 153; *United States* v. *Arrendondo*, 6 id. 744.

The word "grant" is *nomen generalissimum.* It includes all sorts of conveyances. *Durant* v. *Ritchie*, 4 Mason, 69; *Elliot* v. *Shaw*, 32 Ohio St. 433.

The word "grant" is of general extent, and may amount to a grant, feoffment, gift, lease, release, confirmation or surrender. *Chester* v. *Willan*, 2 Saund. 96a; 14 Am. & Eng. Ency. of Law, (2d ed.) 1112.

A grant, in its own nature, amounts to an extinguishment of the right of the grantor and implies a contract not to re-assert. 15 Am. & Eng. Ency. of Law, (2d ed.) 1035; 4 Wheat. 682.

A grant is a contract executed. *Bristo* v. *Evans*, 2 Overt. (Tenn.) 346.

A mere breach of contract on the part of a State does not in any way impair its obligation. *Brown* v. *Colorado*, 106 U. S. 95; 5 Col. 596; 64 N. Y. 107; 15 Am. & Eng. Ency. of Law, (2d ed.) 1041.

H. J. HAMLIN, Attorney General, (JOSEPH N. CARTER, of counsel,) for appellees:

The court is without jurisdiction, as this is an action, in effect, against the State. The money involved is the money of the State, and the canal, to preserve which it was appropriated, is the property of the State.

A suit brought against an officer of the State with the purpose to affect the property of the State, or to enforce against the State a contract, or to restrain an officer from executing for the benefit of the State an unconstitutional law, is a suit against the State. *People* v. *Dulaney*, 96 Ill. 510; *In re Mt. Vernon*, 147 id. 359; *Hagood* v. *Southern*, 117 U. S. 53; *Insurance Co.* v. *VanCleave*, 191 Ill. 413; *Louisiana* v. *Jumel*, 107 U. S. 711; *In re Ayers*, 123 id. 444; *Fitts* v. *Mc-Ghee*, 172 id. 529; *Trust Co.* v. *Stearns*, 119 Fed. Rep. 790.

In equity, those having a beneficial interest in the subject matter, as well as those having the legal interest, are necessary parties, and must be joined as parties complainant or defendant. *Moore* v. *School Trustees*, 19 Ill. 86; *Frye* v. *Bank*, 10 id. 332; *Dubs* v. *Egli*, 167 id. 514; *Gordon* v. *Johnson*, 186 id. 29; *Girard* v. *Bates*, 124 id. 151.

The exemption of a State from suit by individuals or corporations is a right that belongs to sovereignty by virtue thereof, and is a principle of the common law of universal application. *People* v. *Bissell*, 19 Ill. 229; *Webster* v. *French*, 11 id. 273; *People* v. *Yates*, 40 id. 126.

There is nothing in the constitution prohibiting the General Assembly from making appropriations to preserve and maintain the Illinois and Michigan canal. On the contrary, the constitution makes it the duty to do so. Const. 1870, art. 4, sec. 18, and sec. 1 of Schedule; Const. of United States, art. 1, sec. 10, and art. 4, sec. 1; *People* v. *Rose*, 166 Ill. 422; *Bank* v. *Billings*, 4 Pet. 514; *Green* v. *Biddle*, 8 Wheat. 1; *Woodruff* v. *Trofull*, 10 How. 190; *Wolf* v. *New Orleans*, 103 U. S. 358; *New Orleans* v. *Lawrence*, 115 id. 650; *County of Moultrie* v. *Banks*, 92 id. 631; *Railroad Co.* v. *McClure*, 10 Wall. 511.

Before the courts can hold a statute which has been duly enacted by the legislature to be unconstitutional and void, they must be able to say, after the most exhaustive and careful examination and deliberation, that there can be no reasonable doubt of the conflict, as asserted, between the statute and some provision of the

constitution. *People* v. *Nelson*, 133 Ill. 575; Cooley's Const. Lim. 218; *People* v. *Thompson*, 155 Ill. 451; *Powell* v. *Commonwealth*, 114 Pa. St. 287.

The constitution of this State is only a limitation upon and not a grant of power to the General Assembly. *Burritt* v. *Commissioners*, 120 Ill. 322; *Winch* v. *Tobin*, 107 id. 212; *Harris* v. *Whiteside County*, 105 id. 445.

It follows that the legislature has all the power respecting the Illinois and Michigan canal, its repair, its maintenance and operation, which has not been taken from it by the constitution in express terms or by necessary implication.

CHARLES L. WALKER, also for appellees.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This was a bill in chancery filed in the circuit court of Sangamon county by the appellant, against the appellees Snively, Newton and Sackett, in their official capacity as Commissioners of the Illinois and Michigan Canal, and the appellee James S. McCullough, as Auditor of Public Accounts of the State, and the appellee Fred A. Busse, as Treasurer of the State, to restrain the said Auditor of Public Accounts from drawing his warrant in favor of the said canal commissioners for certain sums of money appropriated by an act of the General Assembly approved May 15, 1903, (Laws of 1903, p. 45,) for the maintenance and protection of the Illinois and Michigan canal and for the necessary and extraordinary expenses thereof, and enjoining the said State Treasurer from paying any moneys out of the public funds of the State on any such warrant, should one be or have been drawn. A temporary injunction was issued as prayed. The defendants to the bill filed a joint answer thereto. The answer was accompanied by the affidavits of several persons, containing statements pertinent to matters alleged in the answer. A general replication was filed

to the answer.   The cause was submitted to the chancellor upon the bill, answer and affidavits filed therewith, the replication to the answer and a stipulation of the parties in substance as follows: That the bill of complaint, as verified under oath of said complainant, shall be considered as the evidence on his part; that the answer of said defendants, verified, together with the affidavits thereof, shall be considered as the evidence of one witness if competent and received by the court, as to substance, on the part of the defendants, and that the court shall consider the averments of said bill and answer, and the statements in said affidavits, as evidence offered by the respective parties, and give to the same the same force and effect as though the testimony of said parties was taken in open court.   The court overruled a motion entered by the appellant to strike the affidavits from the files, to which ruling exception was entered, and the appellant thereupon gave in evidence his bill, duly verified, and the appellees read in evidence their answer thereto and the affidavits filed in support of the answer.   The decree of the court was that the bill should be dismissed and the injunction dissolved, from which decree the appellant has prosecuted this appeal.

The General Assembly of the State, at its session in 1903, adopted statutes authorizing the appropriation of $152,950 from the public moneys of the State for the purpose of providing means for maintaining the Illinois and Michigan canal in a navigable condition and maintaining and operating the Bridgeport pumping station and dredging the steamboat channel and basin at LaSalle. The act authorized the Auditor of Public Accounts, on receipt of the certificate of the canal commissioners showing that the moneys are needed for the purposes for which the same were appropriated, to draw his warrant on the State Treasurer in favor of the canal commissioners for such sums so appropriated.   The bill alleges that the complainant is a citizen of the State of Illinois

and the owner of real and personal property which is
subject to taxation in said State and is taxed therein,
and further alleges that such appropriations of the pub-
lic moneys are prohibited by the provisions of the con-
stitution of 1870 with reference to canals, and that the
acts of the legislature authorizing such appropriations
of the public moneys are therefore void, and the prayer
of the bill is, that such alleged misappropriation of the
moneys of the State be restrained and enjoined. Appel-
lees contend the bill is a suit against the State of Illinois,
and should be dismissed for the reason that section 26
of article 4 of the constitution of 1870 declares the State
shall not be made a party to any action at law or suit in
chancery.

The bill is not a suit against the State. It does not
implead or ask any relief against the State. The relief
asked is, that officials of the State charged by law with
the performance of official duties be restrained from a
misuse of moneys entrusted to them or from applying
such moneys to purposes not warranted by law. The
question to be determined is whether the State has, by
law, authorized the payment from the public funds of
sums of money to the commissioners of the canal, to
be used in keeping in repair, improving, maintaining and
operating the Illinois and Michigan canal. In equity the
money in the State treasury is the money of the people
of the State, and suits by a tax-payer to restrain the mis-
appropriation by public officers of such money to an un-
authorized purpose are not suits against the State. We
have frequently maintained the jurisdiction of courts of
equity to entertain bills in behalf of tax-payers to re-
strain misappropriation of funds by public authorities.
(*Littler* v. *Jayne*, 124 Ill. 123; *Adams* v. *Brenan*, 177 id. 194.)
In *Burritt* v. *Commissioners of State Contracts*, 120 Ill. 322,
this court entertained an original petition for a writ of
*mandamus* to compel the commissioners to provide the
petitioner, who was a justice of the peace, with a certain

legal publication, to be paid for out of public moneys, and considered the contention on its merits. In *German Alliance Ins. Co.* v. *VanCleave*, 191 Ill. 410, we upheld the jurisdiction of a court of chancery to restrain the insurance commissioner from paying to the Treasurer of the State moneys collected as taxes from certain insurance companies, and to enjoin the State Treasurer from receiving such taxes.

Public officials of the State who are charged by law with the duty of granting certificates or warrants purporting to authorize the payment of moneys from the treasury of the State may be restrained from issuing certificates or warrants for the payment of the public money for any other than purposes for which such moneys may be lawfully used, and the Treasurer of the State may be enjoined from paying public funds for purposes or objects not authorized by law. An unconstitutional statute is not law, and an appropriation of public funds in pursuance of an unconstitutional statute is a misuse of funds, which may be restrained by injunction. Suits of that character, such as bills to enjoin the Governor, Secretary of State and Treasurer of State from selling lands of the State under an unconstitutional statute, (*Pennoyer* v. *McConnaughy*, 140 U. S. 1,) a suit against the Governor and other State officers to restrain the issuing of a bond in violation of a statute, (*Louisiana Board* v. *McComb*, 92 U. S. 531,) and a suit against the Auditor of a State to restrain the execution of an unconstitutional statute, (*Osborn* v. *Bank of the United States*, 9 Wheat. 738,) have been held not suits against the State and not violative of constitutional provisions against impleading the State in any action at law or suit in chancery. We may therefore consider the contention of the appellant that the General Assembly was wanting in power to authorize the public moneys to be taken out of the treasury of the State and applied to maintenance and operation of the Illinois and Michigan canal. The General Assembly pos-

sesses full, plenary power of legislation in the absence of some inhibitory constitutional provision. It is composed of representatives of the people of the State, and may therefore exercise every legislative function not denied it by the constitution and not delegated to some other department of the State government.

The contention of the appellant is, that the provision of the constitution of 1870 which relates to the Illinois and Michigan canal prohibits the legislature from making any appropriations from the treasury of the State for the maintenance and operation of the Illinois and Michigan canal or for the ordinary and necessary or extraordinary expenses of the canal. The constitutional provision referred to reads as follows: "The Illinois and Michigan canal shall never be sold or leased until the specific proposition for the sale or lease thereof shall first have been submitted to a vote of the people of the State at a general election, and have been approved by a majority of all the votes polled at such election. The General Assembly shall never loan the credit of the State, or make appropriations from the treasury thereof, in aid of railroads or canals: *Provided*, that any surplus earnings of any canal may be appropriated for its enlargement or extension." (Const. 1870, separate sec. 3; Starr & Cur. Stat. 1896, p. 206.)

It will be observed the section consists of but two sentences. The first sentence inhibits the sale or lease of the Illinois and Michigan canal except by the authority of the people of the State, expressed at the polls at an election to be held throughout the State on a specific proposition for the sale or lease thereof. This sentence leaves unaffected the power of the legislature to operate the canal and to make appropriations of the public moneys to defray the expenses of the operation, maintenance or preservation thereof. Prior to the formation of the constitution the canal had been operated under the direction and by the authority of the General Assem-

bly, and an income had been derived in excess of all
the expense of operation, and it was being so controlled,
managed and operated at and during the time the consti-
tutional convention was in session. Notwithstanding the
fact that at the time of the formation of the constitution
of 1870, and also during all prior years, after the comple-
tion of the canal, all the expenses of operation and main-
tenance of the canal had been met and discharged out
of the tolls and earnings, and the income had each year
exceeded the expenses of the operation and maintenance
thereof, still we are advised by the discussion that arose
in the constitutional convention upon the question of the
adoption of this sentence, and more particularly as to the
adoption of the second sentence of the constitutional pro-
vision under consideration,—the provision having been
divided and a separate vote had on each sentence,—that
it was to be apprehended that the more rapid means of
transportation afforded by railroads and the great in-
crease in the number of railway lines in the territory con-
tiguous to the canal, would divert traffic from the canal,
and that in the future the tolls and income from the canal
would most likely decrease and shrink away, and pos-
sibly fall below the amount necessary to defray the ex-
penses of maintaining and operating it, and that in the
not remote future the operation and maintenance thereof
might, and probably would, become a burden and expense
to the people if the public moneys were not protected by
the constitution against legislative enactments making
appropriations in aid of the canal, and to meet such defi-
ciencies as might occur in the course of the operation and
maintenance thereof. We hereinafter refer to this dis-
cussion and quote the remarks of members of the conven-
tion. The second sentence of the constitutional provision
here being considered, it is urged, was framed for the
express purpose of protecting the treasury of the State
in the event the canal should cease to be self-supporting.
The second sentence may be here repeated for more con-

venient reference: ."The General Assembly shall never loan the credit of the State, or make appropriations from the treasury thereof, in aid of railroads or canals: *Provided*, that any surplus earnings of any canal may be appropriated for its enlargement or extension."

The constitution of a State derives its force and authority from the vote of the people adopting it. For that reason it is a general rule that in construing the provisions of a constitution the words employed therein shall be given the meaning which they bear in ordinary use among the people. The natural and ordinary meaning of the words is to be accepted except where a word is used the meaning whereof is established by statute or by judicial construction. The word "aid," employed in the body of the sentence, has no such established meaning, or any technical meaning different from that given it by the lexicographers as the meaning thereof as understood generally among men. In ordinary acceptation it means to help; to support; to assist; to sustain; to succor or to relieve; and so it is defined by Mr. Webster. The inhibition against making appropriations from the treasury of the State in "aid" of canals, if the word "aid" be given its natural and ordinary meaning, would deny to the legislature the power to appropriate money from the treasury for any of the purposes of the Illinois and Michigan canal here asked to be enjoined, if the word "canals," used in the body of the sentence, includes the Illinois and Michigan canal.

If the proviso had not been appended to the body of the sentence some weight and force would attach to the argument that the general word "canals," found in the body of the sentence, had no reference to the canal owned by the State; that it was absurd to speak of the State loaning its credit to itself, as the owner of the Illinois and Michigan canal, and that a prohibition against the application of the public moneys in aid of canals should not, in reason, be understood to forbid the application

by the State of moneys from the treasury to defray the necessary expenses of operating, repairing, maintaining and preserving a canal which belonged to the State; that under the correct interpretation and construction the prohibition was against lending the credit of the State or appropriating the moneys of the State in aid of railroads or canals which individuals or private corporations owned or were preparing to construct as the business enterprises of private proprietors. The true constitutional intent can, however, only be ascertained by the careful consideration of the entire sentence,—the body thereof and the proviso,—for one of the offices of a proviso is to qualify the generality of the body of the sentence of which it is a part, though it can have no potency to enlarge the scope or force of the enactment. (*Sarah* v. *Borders*, 4 Scam. 341; *Huddleston* v. *Francis*, 124 Ill. 196; *In re Day*, 181 id. 73.) The office intended to be served by the proviso here in review is clear. Manifestly the proviso, though the words "any canals" are employed therein, had and has reference only to the canal that was owned by the State,—the Illinois and Michigan canal. The State had the right to control and direct the application of the earnings of that canal, and of no other. Under the statutes then in force the "surplus earnings" of the Illinois and Michigan canal were required to be paid into the treasury of the State, and the State had power to permit such surplus earnings to be drawn out of its treasury and applied to the extension or enlargement of the canal owned by the State. The State had no power to control the manner in which the surplus earnings of any canal other than the Illinois and Michigan canal should be expended. The State owned but one canal,— the Illinois and Michigan canal,—had power to control the surplus earnings of but that one canal, and the proviso had reference only to that canal. The words "any canal" were no doubt used in the proviso in an excess of caution, in order that the proviso might apply as well to

any other canal of which the State might possibly afterward become the owner, in order the restriction might be general and uniform, but it could in no contingency apply to a canal not owned by the State. The body of the sentence (the proviso being excluded) prohibits the appropriation of any of the public moneys "in aid" of canals, generally. The proviso appended thereto authorizes the appropriation of the "surplus earnings" of the Illinois and Michigan canal to the enlargement and extension of that waterway. The body of the sentence is general in its terms and its objects, and prohibits the appropriation of any of the public moneys in aid of any and all canals. The proviso qualifies the generality of this prohibition by excepting therefrom any moneys which have come into the treasury of the State from the "surplus earnings" of the Illinois and Michigan canal, and by providing that any such surplus earnings may be devoted by the General Assembly to the purposes of enlarging or extending that canal. The rule of construction in such instances is that the proviso is to be strictly construed, and that it takes no case out of the prohibition declared in the body of the sentence other than the precise case that is included in the terms of the proviso.

The Supreme Court of the United States, speaking through Mr. Justice Story, in the case of *United States* v. *Dickson,* 15 Pet. 165, said: "Passing from these considerations to another, which necessarily brings under review the second point of objection, we are led to the general rule of law which has always prevailed and become consecrated almost as a maxim in the interpretation of statutes, that where the enacting clause is general in its language and objects, and a proviso is afterwards introduced, that the proviso is to be strictly construed, and takes no case out of the enacting clause which does not fairly fall within the terms of the proviso. In short, the proviso carves special exceptions, only, out of the enacting clause."

The proviso to the sentence of the constitution here under consideration carves a special exception, only, out of the general inhibition found in the body of the sentence and leaves the general inhibition in full force and vigor, save only to the extent it is qualified by the exception of the proviso.   The proviso therefore takes out of the general inhibition that which, but for the proviso, would have remained within such general inhibition, and leaves within the general inhibition found in the body of the sentence all that is not specifically taken out by the terms of the proviso, strictly construed   The inhibition against the application of the public moneys that had been or should be gathered into the treasury of the State by taxation of the property of tax-payers of the State, to the purpose of "aiding" the canal, was not qualified by the proviso or in any manner affected thereby.   On the contrary, the presence of the proviso demonstrates that it was the understanding of the framers of the constitution that the body of the sentence prohibited the appropriation of the public money in aid of the Illinois and Michigan canal, and that the proviso was added for the purpose of so qualifying that prohibition that it might be lawful to use the "surplus earnings" of that canal which should come into the treasury in enlarging or extending it, if the General Assembly should ever deem that course to be desirable.   Therefore it seems to us to be so clear as to be beyond doubt or debate, that the proviso was annexed to the sentence for the reason it was the understanding of the convention that the word "canals," employed in the body of the sentence, was intended to include the Illinois and Michigan canal, and that the body of the sentence, in the absence of a proviso thereto, would absolutely inhibit the appropriation of any of the public moneys in aid of that canal, and that as to the Illinois and Michigan canal an exception to the general inhibition was intended, namely, that appropriations of

the surplus earnings of the Illinois and Michigan canal might be made for the purpose of extending or enlarging it. Such being the object intended to be secured by the addition of the proviso, it is unmistakable that it was the understanding of the framers of the constitution that the body of the sentence absolutely inhibited the appropriations of the public moneys in aid of or for any of the purposes of the Illinois and Michigan canal, and that the proviso was added to qualify, in a degree, the generality of the language of the body of the sentence and to limit the inhibition against the appropriation of any money from the treasury of the State to the purposes of or in aid of the canal, to such an extent as would leave it within the power of the legislature to appropriate the moneys which had come into the treasury from the surplus earnings of the canal to the extension or enlargement of that waterway.

The constitutional intent, then, to be gathered from the entire provision is, that the power to sell or lease the canal shall remain with the people; that the control and management thereof, and the operation of the same, if that shall seem wise and best, should be possessed by the legislature, to which power of management, control and operation there was attached an inhibition against the application of the public moneys which should be derived from taxation of the property of the citizens of the State to any of the purposes of the canal, but that any moneys which should be paid into the treasury of the State as surplus earnings of the canal might be drawn therefrom and applied to the extension or enlargement of the canal. The constitutional intent was and is, that the canal shall be self-supporting and that the people of the State shall not be taxed to aid it in any way.

In construing constitutional provisions the true inquiry is, what was the understanding of the meaning of the words used by the voters who adopted it? Still, the practice of consulting the debates of the members of the

convention which framed the constitution, as aiding to a correct determination of the intent of the framers of the instrument, has long been indulged in by courts as aiding to a true understanding of the meaning of provisions that are thought to be doubtful. The discussion in the constitutional convention of questions connected with the constitutional provisions here under consideration supports the construction we have given to it.

Mr. Archer, a member of the convention, said, among other things: "I am willing to vote for the proposition in these reports that this canal shall not be leased or sold and that it shall forever remain the property of the State. Then, if it appears, in the course of a few years, that the canal is a burden; that it is unprofitable; that to lease or sell it would promote and secure the prosperity of the people better than to keep it, let the legislature submit an amendment to the constitution to that effect, —revoke what has been done and act upon the policy subsequently discovered to be correct and proper. But, Mr. Chairman, I will not by my vote inaugurate, however remotely, a system of appropriations for this canal beyond what its revenues may enable it to have appropriated to it." (Debates Const. Con. vol. 1, p. 374.)

Mr. McCoy, another delegate, remarked: "We all know that this canal has been a fruitless enterprise. We all know that it has yielded nothing to the State of Illinois. We all know that there has been a large sum of money spent in its construction, and it cannot now be well claimed by the friends of the enterprise that the people of the State of Illinois are to be further taxed.   *   *   * But I have no objection to this canal. It is an elephant on our hands. The gentlemen concede that we ought not to retain the animal on our hands much longer without special favor. I am decidedly in favor of its feeding itself for a while." (Debates Const. Con. vol. 1, p. 386, col. 2.)

Mr. Washburn, also a delegate, gave expression to his views as follows: "If gentlemen would be satisfied with

a simple provision that the legislature should not sell or lease or dispose of this canal without the consent of the people, they could get it. We have no objection to that; we are willing to accede to that much, but that will not be accepted. That is not what is wanted. I believe members have gone so far as to say that would be no boon if they are prohibited from making appropriations for the canal. The appropriations are what they want, what they expect and what we do not want you to have. We are willing for you to have your canal. We are willing you should keep all you have; we are willing you should run your canal and make all you can out of it,—have all the benefits and proceeds of it,—giving you the advantage of $7,000,000 over the people of the State; but do not ask us to tie the incubus of that canal on the people of the State for all time to come, so that you may have lever power wherewith to obtain future appropriations out of the legislature." (Debates Const. Con. vol. 1, p. 431, col. 3.)

Mr. Pillsbury, a member of the convention, manifestly understood that the inhibition prevented the appropriation of the public moneys to keep the canal in repair. He desired that the propositions contained in the second sentence of the constitutional provision should be so divided that the members might vote separately upon the question of inhibiting appropriations to "railroads" and the question of making appropriations in aid of "canals," and moved for a division of the proposition accordingly, and in support of his motion said: "Voting to aid railroads is a very different thing from voting appropriations to the canal which we already have. I do not wish to prevent the legislature from protecting the property they already own, in case the interest of the people demands an appropriation to keep the canal in repair. I desire to vote upon the question freed from the connection with railroads." (Debates Const. Con. vol. 1, p. 486, col. 2.)

Mr. Hayes also desired a similar division of the question, and in support thereof said: "Mr. President, I desire to divide the second branch so as to have a separate vote upon the proposition that the State shall make no appropriations to protect her property in the canal. I desire to have a separate vote upon that proposition." (Debates Const. Con. vol. 1, p. 485, col. 1.)

Mr. Benjamin voted against the adoption of the constitutional provision we are considering, and in explanation of his vote said: "Mr. President, I desire to explain my vote. I am in favor of the proposition that the General Assembly shall not make appropriations from the treasury in aid of railroads, but I am opposed to any prohibition by which the General Assembly would be precluded from making appropriations from the treasury for the repair and preservation of the property of the State,—the Illinois and Michigan canal. I therefore vote no." (Debates Const. Con. vol. 1, p. 486, col. 3.)

Mr. Merriam, another member of the convention, in explanation of the vote cast by him against the adoption of the provision, among other things said: "While I will very cheerfully vote in favor of the proposition to prevent the State from appropriating money for railroad purposes in any shape, I am opposed to the other part of the proposition, and therefore vote no." (Debates Const. Con. vol. 1, p. 486, col. 3.)

Mr. Wagner, also a delegate, voted against the proposition, and when doing so said: "I vote no, for the reason that I believe that the proposition robs the State of its ability to take care of itself and protect the canal." (Debates Const. Con. vol. 1, p. 486, col. 3.)

A contrary view of the meaning and effect of the constitutional provision was expressed but by one member of the convention, so far as we are advised, viz., Mr. Browning. That gentleman, in response to the statement of Mr. Benjamin that he was opposed to prohibiting the General Assembly from making appropriations

of public moneys for the repair and preservation of the Illinois and Michigan canal and for that reason voted against the provision, expressed the opinion that the provision did "not touch the power of the General Assembly to keep the canal in repair." (Debates Const. Con. vol. 1, p. 486, col. 3.)

It is therefore seen that the meaning we have given to the constitutional provision is the same as that given it by all but one of the members of the constitutional convention who, so far as we are advised, gave expression to their views in the debate.

Though it does not aid to the determination of the question of the power of the legislature to make the appropriation in question, it is not inappropriate to remark that the fears entertained by members of the constitutional convention that more modern and more speedy means of transporting passengers and commodities would soon supplant the canal and divert traffic from it, and the canal would become practically of no use as a waterway or highway of traffic and commerce and would cease to produce an income sufficient to pay the expenses connected with its management, and would, unless restrained by the constitution, become a regular applicant at the door of the State treasury for appropriations of money of the tax-payers of the State, have been verified. In 1876 the tolls received for the use of the canal aggregated $113,293, but since that year there has been a marked and substantially gradual decrease in such receipts. In 1900 so little demand was there for the canal as a highway or waterway for transportation of persons or property that but $13,867 were paid as tolls. In 1901 the use of the canal for the purpose of trade or commerce was so little availed of that but $8120 were collected from tolls. The gross receipts were much larger in all the years than the sums stated, but the excess arose from sales of ice privileges and sales of water power. But in addition to all receipts, of every character, during these

years, heavy appropriations from the treasury of the
State, amounting to something more than one-half a mil-
lion dollars, have been asked and obtained from the pub-
lic treasury to meet the deficiencies arising from the
management and operation of the canal. The canal has
practically fallen into disuse for any of the purposes
of transportation of either persons or property, and has
been perverted to mere commercial purposes of supply-
ing water power to those along its banks and selling
privileges to cut ice from its pools. It is no longer a
highway of commerce.

It is argued by counsel for appellees in support of
the contention that the constitutional provision, under
the proper construction thereof, does not deny to the
General Assembly power to appropriate public moneys
to defray the expenses of operating and maintaining the
canal, that the first sentence of the constitutional pro-
vision is particular and specific and relates to but one
canal,—the Illinois and Michigan canal; that it deprived
the legislature of power to sell or lease the canal until
authorized by a vote of the electors of the State; that
this limitation on the power of the legislature to sell or
lease the canal demonstrated that the members of the
constitutional convention were impressed with the im-
portance of the canal to the people as a means of trans-
portation of their commodities and as having a tendency
to check unjust and excessive charges by railroads, and
that it is manifest that it was the constitutional intent
that the legislature should keep the canal in usable con-
dition and operate it, even if it should become necessary
to appropriate moneys gathered into the treasury by
taxation of the property of citizens of the State gen-
erally, and that the inhibition contained in the second
sentence is general, only, and does not specially inhibit
appropriations of the public moneys to repair or main-
tain the Illinois and Michigan canal, and hence that
that which is specific and particular in the first sentence

should control over that which is general in the second
sentence. This argument is faulty in its premise and
hence erroneous in its conclusion. The restriction in the
first sentence against the sale or lease of the canal by
the General Assembly does not in express words or by
fair implication impose it upon the legislature, as a con-
stitutional duty, to operate the canal, either while it
could be made to pay or in the event it failed to earn
enough to pay expenses. The restriction imposed no
duty on the legislature, but left the law-making body
free to deal with the canal as its wisdom and judgment
should dictate, save that the canal could not be sold or
leased. This restriction alone considered, the legislature
had power to operate the canal even at the expense of the
general tax-payers, or to abandon the operation thereof
and let the canal remain idle and unused. No constitu-
tional duty to operate the canal being declared by the
first sentence, the general inhibition found in the second
sentence against appropriations in aid of the canal is not
in conflict with the first sentence.

The suggestion is made that this supposed conflict
between the first sentence and the body of the second
sentence may be reconciled by regarding the inhibition
against lending the credit of the State or making appro-
priations of the public moneys in aid of railroads or ca-
nals as intended only to inhibit loaning the credit of the
State or appropriating the public money to aid in building
and constructing railways or canals, and as not intended
to include and prohibit appropriations of the public mon-
eys to meet and discharge indebtedness occasioned in
the course of the operation of the Illinois and Michigan
canal; that it was only constructive work, building rail-
roads or digging canals,—not the expenses of operation;
—that was inhibited by the general language of the sec-
ond sentence. In support of the suggestion it is pointed
out that the proviso relates only to construction work,—
that is, the enlargement or extension of the canal,—and

only qualifies that which was inhibited by the body of the sentence, namely, aiding in constructive work. If such a construction could be given the sentence, the inhibition would be so restricted that there would be no prohibition against loaning the credit of the State or appropriating money from its treasury to aid any of the purposes of any railroad or canal, other than the work of building or constructing such railroad or canal. If that view is correct, the General Assembly may open the treasury of the State and draw therefrom the public money and apply it to the indebtedness of any railroad or canal, other than indebtedness incurred for what is called constructive work. This would be, in substance, to embark again on the policy of fostering and supporting internal improvements by applying the moneys of the tax-payers to the discharge of the indebtedness of railroads and canals,—a conclusion which is so inconsistent with the manifest intent of the framers of the constitution as to be entirely beyond serious consideration.

The appellees further insist, to quote from their brief, that "in construing a constitutional provision an important rule to be observed,—one often of a controlling character,—is, that a contemporaneous exposition by the legislative as well as of the executive branch of the State government is entitled to great weight in ascertaining the meaning of such provision concerning the construction of which different minds might not agree."

It appears from the record that the tolls received for the use of the canal during the years after the adoption of the constitution of 1870 until the year 1877 exceeded the gross expenses connected with its management. In the year 1877 there was a deficiency of about $14,000, but no application was made to the legislature for an appropriation by reason thereof. In 1878 the tolls exceeded the gross expenses in the sum of about $2000, but in 1879 the gross expenses exceeded the tolls in the sum of something more than $8000. Since 1879 the income of the

canal as a highway or waterway of trade and commerce
has dwindled away, until in 1901 the total tolls received
amounted to but $8120, the expenses for said year 1901
being $111,002. In 1879 the legislature adopted an act
appropriating the sum of $30,000 to be applied to the pur-
pose of making necessary repairs and put and keep the
canal in a navigable condition, to be used only after
all the surplus earnings of the canal had been applied
to such purposes. In 1883, in 1891, in 1897, in 1899 and
in 1901 like enactments were adopted making appropri-
ations in aid of the canal, and also in 1903, when the
act here involved was adopted. The sum total of these
appropriations exceeds one-half million of dollars in
addition to the sums specifically appropriated to con-
struct the dams at Copperas Creek and Henry. The an-
swer of appellees avers that the sums appropriated in
1879 and 1883, together amounting to $70,000, were not
used on the canal, and that only a portion of the later
appropriations were so used. To what purpose these
moneys not used on the canal were applied is not dis-
closed, save that it is to be inferred such moneys were
expended in and about the dams at Copperas Creek and
at Henry, and therefore for the benefit of the canal. The
additional sum of $76,452 was appropriated out of the
public moneys to aid in building those locks and dams,
and the earnings of the canal to an amount not disclosed
were also devoted to the same purpose under enactments
of the General Assembly. These various enactments were
approved by the chief executive of the State at the time
of their adoption, respectively. The earlier of these acts
was not passed until nine years after the adoption of the
constitution, in 1870. Contemporaneous and continuous
action of the General Assembly, sanctioned by the ap-
proval of the Governor, would be entitled to much weight.
(*Bunn* v. *People*, 45 Ill. 397.) The literal meaning of "con-
temporaneous" is "living or existing at the time." (8 Cyc.
1145.) While the principle of construction could not be

fairly held to require perfect or literal coincidence in point of time, the lapse of time,—of years,—weakens the force of the influence of the enactment as a practical and contemporaneous construction of the provision. Out of that deference which is always due from the judicial to the executive and legislative departments of the State, these various enactments making appropriations in aid of the Illinois and Michigan canal present themselves as worthy of our consideration as practical expositions of the meaning accorded to this provision of the constitution by the different executives, and legislatures by whom the acts were, respectively, adopted.

We are referred, however, to an act of the General Assembly which was adopted on the 27th day of March, 1874, and approved by the then chief executive of the State. This enactment was passed five years earlier than the act of 1879, which was the first of the acts relied on by the appellees as a practical contemporaneous construction of the constitutional provision. The act of 1874 was passed within four years after the adoption of the constitution, while nine years elapsed before the passage and approval of the act of 1879. The enactment of 1874 constitutes chapter 19 of our Revised Statutes. It provides that the canal commissioners shall continue to consist, as before, of three discreet and skillful persons to be appointed by the Governor, by and with the consent of the Senate. Section 9 of the act prescribes the duties of the commissioners. The second subdivision of the section is as follows:

"*Second*—To cause the said canal, locks and dams and appurtenances to be kept in good and sufficient repair and condition for use, and whenever it shall be necessary for that purpose, they may, by themselves or their agents, enter upon and use, overflow or damage any contiguous lands, and procure and appropriate all such material as in their judgment may be necessary or proper to be used in making such repair, build or construct any dam, lock,

or other improvement, and may take proceedings in their official name to ascertain the compensation therefor, in the manner at the time provided by law for the exercise of the right of eminent domain: *Provided*, that the damages, cost of materials and improvements shall in all cases be paid out of the net proceeds derived from tolls."

It will be noted that it was deemed important to append a proviso to the body of this subdivision of the section specifically declaring that the cost of material used and of improvements authorized to be made, and the damages which might be incurred if necessary to keep the canal in good and sufficient repair and condition for use, should "in all cases" be paid out of the net proceeds derived from the tolls. This proviso indicates that the legislature of 1874 understood the inhibition of the constitutional provision against making appropriations of the public moneys in aid of the canal as we have construed it, and that they attached the proviso as a limitation upon the power of the commissioners to make the repairs and improvements and exercise the power of eminent domain and do the things specified in the body of the subdivision of the section, by restricting them in the exercise of such powers to the extent that the obligations thereby incurred could be paid out of the net proceeds of the tolls. This legislative interpretation of the constitutional provision was more nearly contemporaneous with the constitution in point of time than the earliest of the enactments relied upon by the appellees as legislative construction of the constitutional provision.

A still earlier enactment, approved April 22, 1871, at the first session of the General Assembly after the adoption of the constitution of 1870, indicates that it was the legislative understanding that the public moneys of the State were not to be appropriated in aid of the canal. The act is found on page 215 of the Session Laws of 1871-72. The preamble recites: "Whereas, the Illinois and Michigan canal, and all remaining canal property, have re-

verted or are about to revert to the State, and it devolves upon the General Assembly to take the necessary steps to insure judicious and economical management of the same; therefore," etc. The first section provides that it shall be the duty of the canal commissioners of the State to examine and audit the accounts of their predecessors, the retiring board of trustees of the canal. The second section empowers the commissioners to take charge of and exercise full control over the Illinois and Michigan canal, and to receive all moneys in the hands of the board of trustees belonging to the canal fund and to pay the same into the State treasury, and to receive all books, office buildings and other property in the possession of the trustees, and directs the board of trustees to comply with the provisions of the act and account for and pay over to the commissioners all such moneys and deliver all such property promptly on the passage of the act. To the body of the second section were appended two provisos, as follows: *"Provided,* that any claim for which the State trustee is now liable may be prosecuted against the said commissioners, and shall be paid by them out of the resources of the canal: *Provided,* that all moneys received for rents and tolls, not necessary for the expenses of the canal and for keeping the same in repair, shall be paid quarterly into the State treasury, and that the rate of tolls shall not be increased without the consent of the General Assembly." The first of the provisos disclaims any liability on the part of the State to pay any claim for which the board of canal trustees may be liable to answer for, and directs that all such claims shall be paid out of the resources of the canal. The second proviso is in accord with the view that the expenses of the canal and of keeping the same in repair were to be paid out of moneys received from rents and tolls for the use of the canal.

In view of the earlier legislation with reference to the canal since the adoption of the constitution, the enact-

ments of 1879 and succeeding years, making appropriations out of the public moneys in aid of the Illinois and Michigan canal, are shorn of much of the influence which otherwise might be accorded to them as aids to the true interpretation of the constitutional provision under consideration. It is a primary rule that the meaning of a constitutional provision is to be ascertained from the language employed therein, and that it is only when ambiguity is found and the meaning is doubtful that the extrinsic aid of practical construction given by other departments of the State is to be resorted to. (6 Am. & Eng. Ency. of Law,—2d ed.—p. 932, and authorities cited in note 5.) In the case of *Phoebe* v. *Jay*, Breese, 268, speaking with reference to repeated enactments of the legislature as aids to the construction of constitutional provisions, it was said: "If they have no power to pass an act, any number of repetitions of unconstitutional acts, or acts beyond the pale of their authority, can never make the original act valid."

We are of the opinion that the true meaning of the constitutional provision with reference to the canal is, that the legislature should have power to operate it to the extent, and to the extent only, that the income of the canal would defray the expenses of operation, maintenance and preservation, and that no moneys shall be appropriated from the treasury of the State in aid of the operation, maintenance or preservation thereof, and that if the earnings of the canal produced a surplus, appropriations of such surplus might be made to aid in the enlargement or extension of the canal, should the legislature deem it wise to so appropriate such surplus.

It is further urged that the State of Illinois procured the funds wherewith to construct the Illinois and Michigan canal from the sales of lands granted to the State by the United States for the sole and only purpose of providing a fund to be applied by the State to the construction of a canal, and that the act of Congress grant-

ing said lands to the State for the purpose aforesaid, contained the following proviso: *"Provided,* that said canal, when completed, shall be and forever remain a public highway for the use of the government of the United States, free from any toll or other charge for any property of the United States, or persons in their service, passing through the same:. *Provided,* that such canal shall be commenced within five years and completed within twenty years, or the State shall be bound to pay to the United States the amount of land previously sold, and that the title to the purchasers under the State shall be valid." It is further insisted that the said act of Congress was adopted by Congress and accepted by the State of Illinois long prior to the adoption of the constitution of 1870, and that it then constituted a contract between the State of Illinois and the United States obligating the State to forever keep and maintain the canal as a public highway or waterway for the use of the government of the United States, free from any tolls or other charges, for any person in the service of the United States or for any property of the United States passing through the same. Upon this insistence it is urged that if the provision of the constitution of the State here under consideration is construed to mean that no appropriation of the public moneys belonging to the State shall be made and applied to the purpose of keeping the canal in proper condition for use as a public highway or waterway, free to be used by the Federal government without charge or toll, the provisions of the State constitution, so construed, would impair the obligation of the contract between the State and the general government, and would be void, as in contravention of section 10 of article 1 of the constitution of the United States, which declares that no State shall enact a law impairing the obligation of a contract.

The question whether the cession of Congress, and the acceptance thereof by the State, constitute a contract on the part of the State to forever keep and maintain

the canal in such condition that the general government may use it as a public highway does not arise for determination. If such a contract arose out of the grant of the land and the acceptance thereof, the complaint that the provision of the State constitution here under consideration, if construed to deny to the legislature power to appropriate any sums whatever from the public treasury for the purpose of repairing or maintaining the canal in usable condition as a public highway would impair the obligation of that contract, cannot be urged by the appellees, who appear in the suit only in their capacity as officers, which positions they hold under and by the authority of the constitution of the State of Illinois and the statutes made in pursuance thereof. The rights of these appellees are not affected by any alleged impairment of the alleged or supposed contract between the Federal government and the State of Illinois. The only person who may complain that a law impairs the obligation of a contract is one who has an interest in the enforcement of the obligation of the contract said to be impaired. (*Templeton* v. *Horne,* 82 Ill. 491; 15 Am. & Eng. Ency. of Law,—2d ed.—1059.) If it shall be found that the grant of the lands and the acceptance thereof constitute a contract, and a question of the enforcement of the contract shall arise, the United States and the State of Illinois, in the exercise of the sovereign power which they respectively possess, it may be confidently asserted, will adjust their respective rights and obligations amicably, honorably and justly. No obligation will be impaired or repudiated. The appellees are but servants of the State, charged, temporarily, with the performance of duties in and about certain public affairs of the State which the State has entrusted to them to be performed, and in that capacity they appear in this proceeding. They do not represent the United States, and have no power to submit for decision the question whether contract obligations accrued by reason of the cession and

acceptance of the lands, much less to insist that, notwith-
standing the changed conditions which have, it seems,
rendered the canal wholly unnecessary, if not entirely
useless, as a highway to the United States, the alleged
contract can only be discharged by the specific perform-
ance thereof.

The circuit court fell into error in dismissing the bill.
The relief prayed for should have been granted.

The decree of the circuit court is therefore reversed
and the cause will be remanded to that court, with direc-
tions to enter a decree perpetually enjoining the appel-
lees, according to the prayer of the bill.

*Reversed and remanded, with directions.*

HAND, C. J., and WILKIN, J., dissenting:

The question presented here for determination is one
of legislative power, and the argument that the opera-
tion of the Illinois and Michigan canal has ceased to be
profitable and therefore it should be abandoned is beside
the case.    Such argument, if presented to the considera-
tion of the legislature, if founded on fact, might be wor-
thy of its consideration, but when urged here as a reason
for holding the statute unconstitutional is without force.
If, however, it is to be given force, the facts should not
be lost sight of that the canal thus far has not been a
burden to the State, and the evidence in this record does
not show it ever will be burdensome to the State.    The
original cost of the canal, which was approximately $5,-
000,000, was paid for from the sale of lands donated to
the State by the general government for canal purposes,
with the express understanding that the canal should be
forever maintained by the State.    From the time of its
construction to the time of the filing of this bill the canal
had earned more than $6,500,000, and there now remains
in the State treasury, after paying all its expenses and
after refunding to the State all moneys appropriated for
its use, the sum of $338,695.76.

At the time the constitution of 1870 was adopted the canal was the most valuable piece of property owned by the State, and the framers of the constitution, to guard against its sacrifice, inserted a provision in the constitution, which was subsequently ratified by the people, that it should never be sold or leased unless the specific proposition for the sale or lease thereof should first have been submitted to a vote of the people of the State at a general election and approved by a majority of all the votes polled at such election. The adoption of that provision showed that it was the fixed intention of the people that they should not be deprived of said canal without their consent, and to effectuate such intention they took from the legislature the power to transfer the canal to any person or corporation, even for a temporary period. The constitution, it must be remembered, is a limitation upon and not a grant of power, and the people having provided that the canal shall not be sold or leased but shall remain the property of the State until they have consented that it might be disposed of by sale or lease, it would seem clear the legislature, as their representative, has the right to provide for the preservation of the canal by the appropriation of funds from the State treasury so long as it belongs to the State, the same as it has for other property of the State, such as the State House, insane asylums, penitentiaries, etc., unless such power has been taken away by the constitution, either in express terms or by necessary implication. It having been provided the canal cannot be sold or leased except upon the vote of the people, the implication would be that it should be maintained and operated until it was sold or leased, and not that it should be allowed to fill up and fall into decay,—and the power to appropriate funds from the State treasury for such purpose would necessarily follow. The implications arising, therefore, are all in favor of the power to appropriate money for the operation and maintenance of the canal, rather than

against it. This being true, we must therefore search the constitution and be able to point out the clause therein which prevents the legislature from appropriating funds from the State treasury with which to operate and maintain said canal, and if such prohibition cannot be pointed out, the power exists, as the power is vested in the legislature unless it has been taken away.

It is contended such limitation or inhibition is found in the following paragraph of the constitution: "The General Assembly shall never loan the credit of the State, or make appropriations from the treasury thereof, in aid of railroads or canals: *Provided*, that any surplus earnings of any canal may be appropriated for its enlargement or extension." We do not think the contention correct. It is a well known fact that prior to the year 1870 municipal aid had been voted to assist in railroad construction in many municipalities throughout the State in a most wild and extravagant manner; that the members who sat in the constitutional convention, held that year, had not forgotten the schemes for a system of internal improvements which in the early history of the State had threatened to bankrupt the State, and that new schemes for the construction of canals to furnish drainage to the city of Chicago, for the reclaiming of the swamp and overflowed lands of the State, and to furnish a waterway connecting the great lakes and the gulf, through the Illinois and Mississippi rivers, were again rife, and anyone who will take the time to read what was said at the time the provision under consideration was before the constitutional convention will conclude at once that the words "the General Assembly shall never loan the credit of the State, or make appropriations from the treasury thereof, in aid of railroads or canals," were incorporated into the constitution to prevent the legislature from lending the credit of the State to or making appropriations from the State treasury in aid of railroads and canals which were not then built,

and which, when constructed, were to be owned and con-
trolled by private persons or corporations,—at least by
parties other than the State,—and that said provision
does not apply to the Illinois and Michigan canal.

This much seems to be conceded, but it is said the
proviso following those general words, viz., "that any
surplus earnings of any canal may be appropriated for
its enlargement or extension," clearly refer to the Illi-
nois and Michigan canal, and prohibit an appropriation
of funds from the State treasury for the maintenance and
operation of said canal. We think the position unten-
able. It is conceded the usual office of a proviso is to
limit the general provision which precedes it, and not to
enlarge it. If this proviso is construed as a limitation,
its effect would be to take from the general provision
some subject which, by the general words used in the pro-
vision which precedes the proviso, would be included in
the general provision, but in no event could it be held
to import into the general provision a subject which was
not there before. As the Illinois and Michigan canal
was not included in the general provision preventing the
pledging of the credit of the State or the appropriation
of funds from the State treasury in aid of railroads or
canals, the same was not imported therein by the pro-
viso, and therefore the appropriation covered by the act
of the legislature now in question is not prohibited by
said constitutional provision, when considered separately
or in connection with the proviso. It also appears from
the debates in the constitutional convention when the
provision now claimed to inhibit the passage of the act
making the appropriation in question was under consid-
eration, that certain members of the convention were
strongly in favor of the enlargement and the extension
of the Illinois and Michigan canal westward to the Mis-
sissippi river, and it would seem from the debate which
then ensued, that the office of the proviso above set out
was, in case the canal should be extended to the Missis-

sippi river,—which also involved its enlargement to a
ship canal,—to prevent the credit of the State and the
moneys in the State treasury being used to pay for or
the State becoming liable in any manner for the cost of
such extension or enlargement, except in so far as the
surplus earnings of the canal would pay for such exten-
sion and enlargement.

As no other express provision of the constitution has
been pointed out which it is claimed prevents the ap-
propriation of moneys from the State treasury for the
operation and maintenance of the Illinois and Michigan
canal, and as the provision pointed out does not, in ex-
press terms or by implication, even remotely refer to the
expenses of operating or maintaining the canal, we take
it there is no provision of the constitution which pro-
hibits such appropriation,—and such was the view of
the gentleman who drafted the constitutional provision
which has been relied upon to defeat said appropriation.
While his view is not controlling, he was admittedly a
profound lawyer. At the time the provision was being
voted upon he said "that this [the constitutional provi-
sion above quoted in full] does not touch the power of the
General Assembly to keep the canal in repair," and in case
of doubt we think the view as there expressed entitled to
great weight, and that after that view has been accepted
and acted upon for more than thirty years by the execu-
tive and legislative departments of the State it should
not be set aside. In considering the constitutionality
of a statute it is the duty of the court to hold it consti-
tutional unless the court can say it is clearly in conflict
with the constitution, and if the court is in doubt and
two views are presented, one of which would sustain and
the other overthrow the law, the court should adopt the
one favorable to the law and hold it constitutional.