AGNES C. HOLLENBECK AND WILLIAM HOLLENBECK, 1111; JOHN MITCHELL, 1112; HORACE SEVERNS, 1113; ANDREW PARR, 1114, Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed November 7, 1929.*

ARLEY MUNTS AND SCANLON & MASSIEON, for claimants.

OSCAR E. CARLSTROM, Attorney General; FRANK R. EAGLE-TON, Assistant Attorney General, for respondent.

Mr. JUSTICE THOMAS delivered the opinion of the court:

By agreement these four cases have been consolidated for hearing, and decision.

The claims are for crops alleged to have been destroyed by the overflow of the Illinois and Michigan Canal on August 8, 1924, and it is charged that the overflow was the result of the carelessness and negligence of the agents and employees of the State in charge of the canal. The Attorney General has filed a demurrer to each of the declarations.

There has been much legislation in connection with this canal. From the earliest history of the State to the present there has been a continuous desire to secure a waterway connecting Lake Michigan with the Mississippi River. In 1822, Congress passed an Act authorizing the State of Illinois to survey and mark the route of the canal through the public lands of the United States. In 1827 Congress granted to the State approximately 300,000 acres of land in aid of the construction of this canal. Work on it was finally begun in 1836 and it was opened for navigation in 1848. It had cost up to that time about $6,000,000.00, and large sums were later expended in repairs and improvements. For a number of years after its completion, the canal carried large volumes of freight, and the tolls produced a large revenue for the State. But, with the development and extension of railroads the business of the canal decreased and its earnings became greatly diminished. This changed condition caused many people to fear that the canal would in time become a liability to the State—a financial burden that would have to be met by increased taxes. These questions led to much discussion in the constitutional convention of 1870, and after full debate that body included the following separate section which was later adopted by the people: ''The Illinois and Michigan Canal shall never be sold or leased until the specific proposition for the sale or lease thereof shall first have been submitted to a vote of the people of the State at a general election, and have been approved by a majority of all the votes polled at such election. The General Assembly shall never loan the credit of the State, or make appropriations from the treasury thereof, in aid of railroads or canals: *Provided,* that any surplus earnings of any canal may be appropriated for its enlargement or extension.'' (Const. Separate Sec. 3.) It will be observed that this section prohibits the Legislature from making appropriations from the State Treasury in aid of canals. Any appropriation to meet expenses or liabilities connected with or growing out of the operation of the canal

would be in aid of it. If the Illinois and Michigan Canal were a private company or corporation, and claimants were damaged in the manner they allege, such damages would be a liability of the canal, and an appropriation by the State to pay them would be "in aid of the canal."

In *Burke* v. *Snively*, 208 Ill. 328, the construction of this section of the Constitution was before the court. In 1903 the General Assembly made an appropriation of $50,000.00 per annum for the purpose of maintaining the canal in a navigable condition. Suit was brought against the canal commissioners, the State Treasurer and the Auditor of Public Accounts to restrain the Auditor from drawing warrants in favor of the commissioners for the sums appropriated and to enjoin the Treasurer from paying them. The trial court dismissed the bill. On appeal to the Supreme Court the Act was held to be in contravention of the above section of the Constitution, and in discussing the provision of the Section prohibiting appropriations in aid of canals (pp. 340-344) the court said: "The constitution of a State derives its force and authority from the vote of the people adopting it. For that reason, it is a general rule that in construing the provisions of a constitution the words employed therein shall be given the meaning which they bear in ordinary use among the people. The natural and ordinary meaning of the words is to be accepted except where a word is used the meaning whereof is established by statute or by judicial construction. The word "aid," employed in the body of the sentence, has no such established meaning, or any technical meaning different from that given it by the lexicographers as the meaning thereof as understood generally among men. In ordinary acceptation it means to help to support; to assist; to sustain; to succor or to relieve; and so it is defined by Mr. Webster. The inhibition against making appropriations from the treasury of the State in "aid" of canals, if the word "aid" be given its natural and ordinary meaning, would deny to the Legislature the power to appropriate money from the treasury for any of the purposes of the Illinois and Michigan Canal here asked to be enjoined, if the word "canals," used in the body of the sentence, includes the Illinois and Michigan Canal.

"If the proviso had not been appended to the body of the sentence some weight and force would attach to the argu-

ment that the general word "canals," found in the body of the sentence, had no reference to the canal owned by the State; that it was absurd to speak of the State loaning its credit to itself, as the owner of the Illinois and Michigan Canal, and that a prohibition against the application of the public moneys in aid of canals should not, in reason, be understood to forbid the application by the State of moneys from the treasury to defray the necessary expenses of operating, repairing, maintaining and preserving a canal which belonged to the State: that under the correct interpretation and construction the prohibition was against lending the credit of the State or appropriating the moneys of the State in aid of railroads or canals, which individuals or private corporations owned or were preparing to construct as the business enterprises of private proprietors. The true constitutional intent can, however, only be ascertained by the careful consideration of the entire sentence,—the body thereof and the proviso,—for one of the offices of a proviso is to qualify the generality of the body of the sentence of which it is a part, though it can have no potency to enlarge the scope or force of the enactment. (*Sarah* v. *Borders*, 4 Scam. 341; *Huddleston* v. *Francis*, 124 Ill. 196; *In re Day*, 181 id. 73.) The office intended to be served by the proviso here in review is clear. Manifestly the proviso, though the words "any canals" are employed therein, had and has reference only to the canal that was owned by the State,—the Illinois and Michigan Canal. The State had the right to control and direct the application of the earnings of that canal, and of no other. Under the statutes then in force the "surplus earnings" of the Illinois and Michigan Canal were required to be paid into the treasury of the State, and the State had power to permit such surplus earnings to be drawn out of its treasury and applied to the extension or enlargement of the canal owned by the State. The State had no power to control the manner in which the surplus earnings of any canal other than the Illinois and Michigan Canal should be expended. The State owned but one canal,—the Illinois and Michigan Canal,—had power to control the surplus earnings of but that one canal, and the proviso had reference only to that canal. The words "any canal" were no doubt used in the proviso in an excess of caution, in order that the proviso might apply as well to any other canal of which the State

might possibly afterward become the owner, in order the restriction might be general and uniform, but it could in no contingency apply to a canal not owned by the State. The body of the sentence (the proviso being excluded) prohibits the appropriation of any of the public moneys "In aid" of canals generally. The proviso appended thereto authorizes the appropriation of the "surplus earnings" of the Illinois and Michigan Canal to the enlargement and extension of that waterway. The body of the sentence is general in its terms and its objects, and prohibits the appropriation of any of the public moneys in aid of any and all canals. The proviso qualifies the generality of this prohibition by excepting therefrom any moneys which have come into the treasury of the State from the "surplus earnings" of the Illinois and Michigan Canal, and by providing that any such surplus earnings may be devoted by the General Assembly to the purposes of enlarging or extending that canal. The rule of construction in such instances is that the proviso is to be strictly construed, and that it takes no case out of the prohibition declared in the body of the sentence other than the precise case that is included in the terms of the proviso.

"The proviso to the sentence of the Constitution here under consideration carves a special exception, only, out of the general inhibition in full force and vigor, save only to the extent it is qualified by the exception of the proviso. The proviso therefore takes out of the general inhibition that which, but for the proviso, would have remained within such general inhibition, and leaves within the general inhibition found in the body of the sentence all that is not specifically taken out by the terms of the proviso, strictly construed. The inhibition against the application of the public moneys that had been or should be gathered into the treasury of the State by taxation of the property of tax-payers of the State, to the purpose of "aiding" the canal, was not qualified by the proviso or in any manner affected thereby. On the contrary, the presence of the proviso demonstrates that it was the understanding of the framers of the constitution that the body of the sentence prohibited the appropriation of the public money in aid of the Illinois and Michigan Canal, and that the proviso was added for the purpose of so qualifying that prohibition that it might be lawful to use the "surplus earnings" of that canal which should come into the treasury in enlarg-

ing or extending it, if the General Assembly should ever deem that course to be desirable. Therefore, it seems to us to be so clear as to be beyond doubt or debate, that the proviso was annexed to the sentence for the reason it was the understanding of the convention that the word "canals," employed in the body of the sentence, was intended to include the Illinois and Michigan Canal, and that the body of the sentence, in the absence of the proviso thereto, would absolutely inhibit the appropriation of any of the public moneys in aid of that canal, and that as to the Illinois and Michigan Canal an exception to the general inhibition was intended, namely, that appropriations of the surplus earnings of the Illinois and Michigan Canal might be made for the purpose of extending or enlarging it. Such being the object intended to be secured by the addition of the proviso, it is unmistakable that it was the understanding of the framers of the Constitution that the body of the sentence absolutely inhibited the appropriations of the public moneys in aid of or for any of the purposes of the Illinois and Michigan Canal and that the proviso was added to qualify, in a degree, the generality of the language of the body of the sentence and to limit the inhibition against the appropriation of any money from the treasury of the State to the purposes of or in aid of the canal, to such an extent as would leave it within the power of the Legislature to appropriate the moneys which had come into the treasury from the surplus earnings of the canal to the extension or enlargment of that waterway.

"The constitutional intent, then, to be gathered from the entire provision is, that the power to sell or lease the canal shall remain with the people: that the control and management thereof, and the operation of the same, if that shall seem wise and best, should be possessed by the Legislature, to which power of management, control and operation there was attached an inhibition against the application of the public moneys which should be derived from taxation of the property of the citizens of the State to any of the purposes of the canal, but that any moneys which should be paid into the treasury of the State as surplus earnings of the canal might be drawn therefrom and applied to the extension or enlargement of the canal. The constitutional intent was and is, that the canal shall be self-supporting and that the people of the State shall not be taxed to aid it in any way."

And on page 356 of the opinion the court further said: "We are of the opinion that the true meaning of the constitutional provision with reference to the canal is, that the Legislature should have power to operate it to the extent, and to the extent only, that the income of the canal would defray the expenses of operation, maintenance and preservation, and that no moneys shall be appropriated from the treasury of the State in aid of the operation, maintenance or preservation thereof, and that if the earnings of the canal produced a surplus, appropriations of such surplus might be made to aid in the enlargement or extension of the canal, should the Legislature deem it wise to so appropriate such surplus."

We think it was the purpose of the framers of the Constitution when they wrote this section and of the people when they adopted it to prevent the maintenance and operation of the canal from ever becoming a source of expense to the State,—to protect the people from ever being taxed to support it—and to require the expenses and liabilities incurred in its maintenance and operation to be paid out of its earnings. The claims in question all arose out of the maintenance and operation of the canal and are only payable, if at all, out of the earnings of the canal, their payment out of the general revenues of the State being prohibited by the provisions of this section of the Constitution.

On April 22, 1871, "An Act to settle up and close the Trust of the Board of Trustees of the Illinois and Michigan Canal" was approved and went into effect. Section 2 of that Act made it the duty of the canal commissioners to take care of and exercise full control over the Illinois and Michigan Canal, and contained the following provisions: *"Provided,* that any claim, for which the State trustee is now liable, may be prosecuted against the said commissioners, and shall be paid by them out of the resources of the canal. *Provided,* that all moneys received for rents and tolls, not necessary for the expenses of the canal and for keeping the same in repair, shall be paid, quarterly, into the State Treasury, and that the rate of toll shall not be increased without the consent of the General Assembly." Prior to the adoption of the Constitution of 1870 it had been held that an action would lie against the State trustee for loss and damage occasioned by negligence in the management and operation of the canal.

The foregoing Act of April 22, 1871, was passed by the first Legislature elected under the Constitution of 1870 and shows that Legislature understood the new Constitution to prohibit appropriations for the payment of claims against the canal and required them to be paid out of its earnings.

On March 27, 1874, "An Act to revise the law in relation to the Illinois and Michigan Canal, and for the improvement of the Illinois and Little Wabash rivers" was approved and went into effect the first of July of that year. This Act gives the canal commissioners the control and management of the Illinois and Michigan Canal. Section 9 of the Act states the duties of the commissioners. The second paragraph of the section makes it their duty to keep the canal, locks and dams in good and sufficient repair and condition for use and authorizes them to "enter upon and use, overflow or damage any contiguous lands, and procure and appropriate all such material as in their judgment may be necessary or proper to be used in making such repair, build or construct any dam, lock, or other improvement, and may take proceedings in their official name to ascertain the compensation therefor in the manner at the time provided by law for the exercise of the right of eminent domain: *Provided,* that the damages, cost of materials and improvements shall in all cases be paid out of the net proceeds derived from tolls." The third paragraph of the section directs the commissioners to cause suits to be brought against persons trespassing on the canal, locks, dams and canal lands and then recites: "They may also appraise or cause to be appraised and adjust all claims for damages growing out of the negligence or carelessness of the persons in charge of said canal by means whereof parties navigating said canal shall sustain damages, and when so appraised or adjusted they may pay the same from the tolls collected, and make report thereof: *Provided,* that such claim for damages and appraisement therein in no single case shall exceed the sum of $100.00. If in excess of that sum they shall report the same to the Governor for further legislation." It will be observed that this section requires all cost of materials and improvements and all claims for damages to be paid out of the earnings of the canal, clearly indicating that the Legislature recognized the Constitution prohibited their payment out of funds derived from any other source.

By the enactment of The Civil Administrative Code of Illinois in 1917 the rights, powers and duties vested by law in "The Canal Commissioners" were given to the Department of Public Works and Buildings and, by the Act approved June 2, 1925, amending The Civil Administrative Code, they were conferred upon the Department of Purchases and Construction. None of these Acts, however, in any way changed Section 9 above mentioned except to transfer the powers and duties of the commissioners to said departments, and that section is still in full force and effect in so far as it relates to the payment of costs, expenses and damages out of the earnings of the canal.

In 1908 an amendment was adopted to separate section 3 of the Constitution which added thereto a provision authorizing the issue of bonds of the State in a total amount not to exceed Twenty Million Dollars to provide funds for the construction of a deep waterway from the present water power plant of the Sanitary District of Chicago near Lockport in Will County to a point in the Illinois River at or near Utica. This amendment did not alter the section as originally adopted except the proviso thereto which was changed to read as follows: "Provided, that any surplus earnings of any canal, *waterway or water power,* may be appropriated *or pledged,* for its enlargement, *maintenance* or *extension.*" The words in italics are those added by the amendment. It is obvious that the added words do not change the construction we have given the section as originally framed. Their addition has the effect of making the prohibition of the section apply to the *waterway* or *water power* as well as to the canal.

Pursuant to the Constitutional Amendment of 1908 the General Assembly in 1919 enacted the Illinois Waterway Act devolving the construction, maintenance, control and operation of the waterway upon the Department of Public Works and Buildings. Section 2 of the Act describes the general route of the waterway and then provides: "If, in the judgment of the Department of Public Works and Buildings, the utilization of sections of the Illinois and DesPlaines rivers is not practicable or feasible, then the general route above described may be deviated from in such sections and in lieu thereof the Illinois and Michigan Canal may be used and improved, or channels outside of such rivers may be constructed." This provision clearly gives the Department

power to use portions of the canal under the conditions mentioned and such portions of it as they have used or may use in the construction of the waterway are or will become subject to the provisions of the Illinois Waterway Act. Section 23 of the Act provides the State shall be liable for damages to real estate which shall be overflowed or otherwise damaged by reason of the construction, maintenance or operation of the Illinois Waterway and for all damages to persons caused by its construction, maintenance or operation. Sections 24 and 25 provide how such damages shall be ascertained and paid. .

Section 24 is as follows: ''All claims for damages to persons (except to employees) and all claims for damages to property, real or personal, shall be ascertained, determined and fixed by the Department of Public Works and Buildings, and paid out of any moneys which shall from time to time be provided for the payment of such claims. In case the claimant and the Department of Public Works and Buildings cannot agree on the amount of such damages, the question shall be submitted to arbitration. The claimant shall select one arbitrator and the Department of Public Works and Buildings shall select another. If the arbitrators so selected cannot agree, then the two arbitrators shall select a third arbitrator. In case the two arbitrators cannot agree upon a third arbitrator, then the resident judge, or if there be none, the presiding judge of the Circuit Court of the county wherein the damages arose shall select such third arbitrator. The decision of a majority of such arbitration board shall be binding and conclusive upon the State and the claimant. The compensation of the arbitrators shall be fixed by the Department of Public Works and Buildings in advance of appointment and such compensation shall be paid by the State. All claims for damages to persons or property shall be filed with the Department of Public Works and Buildings within five years after the injury complained of.''

Section 25 gives the Court of Claims jurisdiction in cases of accidental injuries or death suffered by employees arising out of and in the course of their employment while employed by the Department of Public Works and Buildings in the construction of the waterway or its appurtenances or any part or parts thereof.

The amendment of the Civil Administrative Code, approved June 2, 1925, transferred the powers and duties of the Department of Public Works and Buildings in relation to The Illinois Waterway to the Department of Purchases and Construction, and that Department is now clothed with all the powers and charged with all the duties given by the Illinois Waterway Act to the Department of Public Works and Buildings. It is clearly apparent from these constitutional and statutory provisions that the Court of Claims has no jurisdiction to pass upon claims for damages to property arising out of the construction, maintenance or operation of any portion of the Illinois and Michigan Canal. If the damages claimed relate to those portions of the canal incorporated in the Illinois Waterway, the amount of the damages must be ascertained, determined, fixed and paid in accordance with the provisions of said Section 24 of the Waterway Act. If they relate to portions of the canal not included in the Illinois Waterway and are such damages as are mentioned in Section 9, of the Act approved March 27, 1874, to revise the law in relation to the Illinois and Michigan Canal, then the amount of such damages must be ascertained and paid as provided by said Section 9 of that Act. If the damages claimed do not come under the provisions of either of those acts and arose out of the maintenance or operation of the canal the Constitution prohibits the appropriation of any money from the general revenues of the State for their payment, as such appropriation would be in aid of the canal.

Claimants urge that claims of like character as theirs have been allowed by this court. It may be that the court has heretofore made mistakes but that does not justify a repetition of the error. It is the duty of all tribunals when they become cognizant of having made an erroneous decision to refuse to follow such decision or recognize it as a precedent. Separate Section 3 of the Constitution plainly provides that appropriations from the State Treasury shall never be made in aid of the Illinois and Michigan Canal. The Constitution is the supreme law of the State,—it is a mandate direct from the people which executive, legislative and judicial officials are all bound to obey.

It necessarily follows from the views we have expressed that the demurrers must be sustained, and they are sustained accordingly.

The claims are therefore denied and the cases dismissed.